UNITED STATES

v.

**Larry R. LONGSTREATH, 302–62–4620, Gunner's Mate (Guns) Second Class (E–5), U.S. Navy.**

**NMCM 91 00774.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 6 June 1991.

Decided 19 June 1995.

---

LT Gerard Wm. Wittstadt, Jr., JAGC, USNR, Appellate Defense Counsel.

LT Karen M. Miller, JAGC, USNR, Appellate Defense Counsel.

LT Margie Sampson, JAGC, USNR, Appellate Defense Counsel.

Capt Michael K. Lambert, USMCR, Appellate Government Counsel.

LT R.W. Sardegna, JAGC, USNR, Appellate Government Counsel.

Before ORR, REED and KEATING, JJ.

REED, Senior Judge:

The appellant was tried by a general court-martial, military judge sitting alone, on various dates between 10 December 1990 and 6 June 1991. Contrary to his pleas, he was convicted of three specifications of indecent acts, involving two different children under the age of 16, in violation of Article 134 of the Uniform Code of Military Justice [hereinafter "UCMJ" or "the Code"], 10 U.S.C. § 934 (1988). The military judge sentenced the appellant to confinement for 6 years, total forfeitures of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the punitive discharge, ordered it executed.

In several pleadings, the appellant, himself, and through various counsel, alleges numerous assignments of error.[1] We have con-

---

1. Appellant filed, through his counsel, a pleading entitled Assignments of Error and Brief in Support Thereof on 16 June 1993, alleging eight assignments of error. Since then we have received three additional pleadings on two separate dates, directly from the appellant. These pleadings raised additional assignments of error and were attached to the record of trial in accordance with *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982). On each occasion, appellate defense counsel was provided the opportunity to expand upon matters raised directly by the appellant. He did so and raised additional assignments of error as well. Appellate defense counsel used two different numbering systems to distinguish errors raised by the appellant from those raised by counsel, and there was some redundancy between the pleadings. For the pur-

**810**

pose of this opinion we have consolidated, where applicable, and renumbered the assignments of error. We have considered all the assignments raised directly by the appellant and by his appellate counsel. The assignments of error generally consist of the following:

I. THE MILITARY JUDGE ABUSED HIS DISCRETION BY NOT STRIKING THE ENTIRE TESTIMONY OF ... [AL] WHEN SHE FLATLY REFUSED TO ANSWER QUESTIONS POSED ON CROSS–EXAMINATION THUS DENYING APPELLANT HIS RIGHT TO CONFRONT AND CROSS–EXAMINE HER[,] A RIGHT GUARANTEED BY THE SIXTH AMENDMENT OF [THE] CONSTITUTION OF THE UNITED STATES.

II. THE GOVERNMENT FAILED TO PROVE APPELLANT GUILTY BEYOND A REASONABLE DOUBT TO SPECIFICATIONS 2 AND 13 OF CHARGE III.

III. A SENTENCE WHICH INCLUDES SIX YEARS CONFINEMENT COUPLED WITH A DISHONORABLE DISCHARGE IS INAPPROPRIATELY SEVERE.

IV. APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE REPRESENTATION BY DEFENSE COUNSEL'S FAILURE TO CALL WITNESSES WHO COULD HAVE PROVIDED EXCULPATORY TESTIMONY ON THE MERITS AND FOR ELECTING TRIAL BY MILITARY JUDGE ALONE.

V. THE COURT–MARTIAL DID NOT HAVE JURISDICTION BECAUSE THE MILITARY JUDGE WAS NOT APPOINTED TO A FIXED TERM OF OFFICE. (Citation omitted.)

VI. THIS COURT HAS NO JURISDICTION BECAUSE ITS JUDGES ARE NOT APPOINTED TO FIXED TERMS OF OFFICE. (Citation omitted.)

VII. APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. (Citation omitted.)

VIII. BECAUSE THIS COURT'S JUDGES WERE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE, THIS COURT HAS NO POWER TO REVIEW APPELLANT'S CASE. (Citation omitted.)

IX. THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN THE MILITARY JUDGE ADMITTED EVIDENCE WHICH WAS FABRICATED AND TESTIMONY WHICH WAS FALSE AND COERCED.

X. APPELLANT WAS DENIED EQUAL OPPORTUNITY TO INSPECT EVIDENCE AVAILABLE TO THE GOVERNMENT WHEN THE MILITARY JUDGE CONDUCTED AN *IN CAMERA* REVIEW OF CALIFORNIA'S CHILD PROTECTIVE SERVICE RECORDS AND CASE NOTES.

XI. APPELLANT IS ENTITLED TO A NEW TRIAL ON THE GROUNDS OF NEWLY DISCOVERED EVIDENCE, NAMELY THE FINDINGS BY A SAN DIEGO COUNTY GRAND JURY THAT WORKERS WITHIN THE COUNTY'S JUVENILE DEPENDENCY SYSTEM MANIPULATED WITNESS TESTIMONY AND COMMITTED PERJURY IN TRIALS STEMMING FROM THEIR INVESTIGATION.

XII. THE CONVENING AUTHORITY'S ACTION IS IMPROPER BECAUSE THE CONVENING AUTHORITY APPROVED TOTAL FORFEITURES, SIX YEARS' CONFINEMENT AND A DISHONORABLE DISCHARGE, DESPITE THE ABSENCE OF A COMPLETE RECORD. (Citation omitted.)

XIII. THE MILITARY JUDGE VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY ALLOWING THE VICTIMS ... [AL] AND [CL], TO TESTIFY AGAINST APPELLANT AT TRIAL, OUTSIDE APPELLANT'S PHYSICAL PRESENCE, BY ONE–WAY CLOSED CIRCUIT TELEVISION.

XIV. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE CONFRONTED WITH THE WITNESSES AGAINST HIM WHEN THE GOVERNMENT FAILED TO CALL ... [AL] AND [CL] AT APPELLANT'S ADMINISTRATIVE DISCHARGE REVIEW BOARD CONVENED IN LIGHT OF THE CHARGES.

XV. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE CONFRONTED WITH THE WITNESSES AND HIS PROCEDURAL RIGHT TO HAVE WITNESSES PRODUCED AT HIS ARTICLE 32 INVESTIGATION HEARING.

XVI. APPELLANT WAS DENIED HIS DISCOVERY RIGHTS BY PLACEMENT OF HIS CHILDREN INTO SEPARATE FOSTER HOMES SO THAT HIS CHILDREN COULD NOT DISCUSS THE ALLEGED OFFENSES, AND BY GOVERNMENT COUNSEL'S AVOIDANCE OF THE MILITARY JUDGE'S ORDER TO ARRANGE MEETINGS BETWEEN APPELLANT'S COUNSEL, THE FOSTER PARENTS AND THE CHILDREN.

XVII. APPELLANT WAS DENIED HIS FIRST AMENDMENT (FREEDOM OF ASSOCIATION) RIGHT WHEN HE RECEIVED WRITTEN ORDERS FROM NAVY FAMILY ADVOCACY FORBIDDING HIM TO HAVE CONTACT WITH HIS WIFE, VERONICA LONGSTREATH.

XVIII. APPELLANT WAS DENIED ACCESS TO FEDERAL CIVIL COURT BY HIS TRANSFER FROM THE NAVAL CONSOLIDATED BRIG IN MIRAMAR, CALIFORNIA TO THE U.S. PENITENTIARY IN LOMPOC, CALIFORNIA BECAUSE HE REFUSED TO WITHDRAW HIS FORMAL GRIEVANCE AGAINST THE DEPARTMENT OF THE NAVY. SUCH GRIEVANCE MUST BE FILED PRIOR TO COMMENCING CIVIL ACTION IN FEDERAL COURT.

XIX. APPELLANT'S RETALIATORY TRANSFER TO THE U.S. PENITENTIARY IN LOMPOC, CALIFORNIA VIOLATES THE CONVENING AUTHORITY'S CONFINEMENT ORDER DIRECTING APPELLANT TO BE CONFINED AT THE NAVAL CONSOLIDATED BRIG IN MIRAMAR, CALIFORNIA UNTIL COMPLETION OF APPELLATE REVIEW.

XX. THE GOVERNMENT VIOLATED RULE FOR COURT–MARTIAL 707(a) AND DENIED

sidered all of these pleadings and the Government's response thereto. We conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.

## I. Facts

This is the appellant's second court-martial for sex related offenses committed upon his minor children. At his first court-martial, which occurred on 28 July 1987, the appellant was convicted by a general court-martial convened by Commander Naval Forces, Philippines, for the offenses of carnal knowledge, sodomy and indecent acts committed upon his step-daughter [hereinafter "AL"], in violation of Articles 120, 125, and 134. He was sentenced to confinement for 90 days and reduction in pay grade to E–5. Prosecution Ex. 19. Shortly after his release from confinement in October 1987, the appellant was transferred to San Diego, California. Local authorities were apparently notified of the appellant's court-martial, and in April 1988, AL and the appellant's two natural daughters [hereinafter "CL" and "SL"] were placed in the custody of the county. By order of the San Diego County Juvenile Court, the children were permitted to continue to reside with their mother provided the appellant removed himself from the family home. The appellant was also ordered not to have any contact with his children other than supervised visitations. Prosecution Ex. 6.

In November 1988, AL was placed in a psychiatric hospital for two months and then transferred to a residential treatment center. During an extended stay at the treatment center, AL revealed to her primary counselor that the appellant had returned to the family home in violation of the court order and that he had continued to molest her after his release from the brig in 1987 until her present hospitalization. An investigation was conducted and appellant was charged at this court-martial with rape, carnal knowledge,

sodomy, and 11 specifications of various indecent acts upon AL, and two specifications for indecent acts upon his natural daughters, CL and SL, in violation of Articles 120, 125 and 134 of the Code, 10 U.S.C. §§ 920, 925, 934 (1994). As reported above, he was convicted of only three specifications involving indecent acts.

The Government presented several witnesses at trial, including AL and CL, who, at the time of trial, were 16 and 10 years' old, respectively. SL was only 2 years' old at the time of trial and did not testify. Pursuant to a request by the Government, the military judge permitted CL to testify outside of the appellant's presence, via closed circuit television, after testimony from a psychologist that testimony by CL in the appellant's presence would seriously affect CL's mental health. According to CL, the appellant had sexually molested her on numerous occasions by fondling her breasts and vaginal area and that on one occasion she had witnessed the appellant commit similar acts upon AL. CL also testified that she had seen the appellant digitally penetrate SL while he was changing her diapers.

AL also testified about the molestations. The Government initially attempted to have her testify in open court. AL's direct testimony commenced on 9 January 1991. Shortly into the direct examination, AL became unresponsive and began to cry when trial counsel attempted to focus her attention on the specific offenses alleged. Despite numerous attempts by trial counsel and the military judge to get AL to respond to certain questions, she remained silent. Trial counsel then attempted to establish a foundation to allow AL to testify via closed circuit television, by eliciting from AL that her reluctance to answer certain questions was caused by the appellant's presence in the courtroom. The military judge denied the Government's request and AL was recalled to the stand on 18 January 1991.

APPELLANT HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.
XXI. THE GOVERNMENT FAILED TO PROVIDE ADEQUATE DISCOVERY WHEN IT NEVER MADE AVAILABLE TO THE TRIAL DEFENSE TEAM A VIDEOTAPED INTERVIEW

CONDUCTED BY NAVAL INVESTIGATIVE SERVICE AGENTS OF THE VICTIM, ... [AL].
XXII. THE MILITARY JUDGE ERRED AS A MATTER OF LAW WHEN HE ADMITTED EXPERT TESTIMONY ON THE CHILD ABUSE ACCOMMODATION SYNDROME.

AL's second time on the stand was also difficult, although she was able to discuss several of the offenses on direct examination. During the individual military counsel's cross-examination, frequent recesses were required due to AL's emotional state, which often included her crying. Despite these recesses, AL indicated that she would not be able to continue with the examination, and the military judge again recessed the court. When the court reconvened on 23 January, AL attempted to continue with the cross-examination, but after only a few questions she became unresponsive and broke down crying. After yet another recess, AL refused to answer any more questions and the trial defense counsel moved to strike her entire testimony. The military judge, however, reconsidered his earlier ruling, based upon AL's demeanor in court, and, allowed AL to testify by means of closed circuit television.

Both parties were provided an opportunity to reexamine AL using closed-circuit television. The Government declined to reopen direct examination and the defense continued cross-examination. Use of the video equipment, however, did not alleviate AL's reluctance to answer many of the questions asked by counsel about the details of certain specifications and the military judge finally excused AL from the stand.

Defense counsel again moved to have AL's entire testimony stricken. The military judge granted the motion with the exception of a portion of AL's testimony regarding two incidents in which the appellant had allegedly fondled her breasts. Record at 474–77. These incidents were the subject of Specification 1 of Charge III involving indecent acts, and were referred to at trial as the "Melrose" and "Navy Lodge" incidents in reference to the family residence at the time they occurred. The military judge subsequently granted a defense motion for a finding of not guilty to Charges I and II, alleging rape and sodomy, as well as Specifications 3 through 11 of Charge III, alleging various indecent acts upon AL. The one specification alleging indecent acts with CL (Specification 12 of Charge III) was also dismissed after the military judge determined the offense was beyond the statute of limitations. As a result the appellant was only convicted of two indecent acts involving AL (Specifications 1 and 2 of Charge III) and one indecent act involving SL (Specification 13 of Charge III).

*II. Right to Confront Witnesses*

The appellant alleges several violations of his right to confront AL and CL in assignments of error I, XIII, XIV, and XV. Although CL was not a victim of any offense of which the appellant was convicted, CL provided evidence concerning offenses against AL and SL.

■■■ The Confrontation Clause provides an accused in a criminal prosecution the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. This includes "an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens,* 484 U.S. 554, 557, 108 S.Ct. 838, 841, 98 L.Ed.2d 951 (1988); *United States v. Morgan,* 40 M.J. 405, 410 (C.M.A.1994). "The purpose of protecting the right to cross-examine is to afford the defendant an opportunity to impeach the credibility of a witness and to explore the witness' motives and biases." *United States v. Berrio–Londono,* 946 F.2d 158, 160 (1st Cir.1991), *cert. denied,* 502 U.S. 1114, 112 S.Ct. 1223, 117 L.Ed.2d 459 (1992). A "defendant's right to confrontation may be violated if the trial court precludes an entire relevant area of cross-examination," *United States v. Lonedog,* 929 F.2d 568, 570 (10th Cir.1991), *cert. denied,* 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991); *United States v. Gray,* 40 M.J. 77 (C.M.A.1994), or when his ability to complete the cross-examination is precluded by a witness' refusal to respond to questions posed. *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). The right to confront witnesses, however, is not absolute. *Owens,* 484 U.S. at 559, 108 S.Ct. at 842.

States have experimented with different procedures to protect children who are the victims of sexual or physical abuse from the traumatic experience of testifying in court. These procedures generally provide some method of inhibiting a witness' view of the defendant, usually through the use of cam-

eras or video-taped testimony, and have been challenged as a violation of the defendant's right to face-to-face confrontation with the witness. *See generally Commonwealth v. Tufts*, 405 Mass. 610, 542 N.E.2d 586 (1989) (upholding a statute authorizing use of video-taped testimony of child victims); *Ortiz v. State*, 188 Ga.App. 532, 374 S.E.2d 92 (1988) (holding that the trial judge did not err in allowing child witness to testify at an angle so defendant was not in direct line of sight); *Strickland v. State*, 550 So.2d 1042 (Ala. Crim.App.1988) (upholding state statute authorizing videotaped depositions of children under age 16); *Commonwealth v. Willis*, 716 S.W.2d 224 (Ky.1986) (upholding state statute authorizing closed circuit television or videotaped testimony of child victim).

The first of these procedures to be challenged before the United States Supreme Court occurred in the case of *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Coy challenged an Iowa statute [2] which permitted the trial judge to place a screen between a defendant and two minor witnesses who had been the victims of sexual assaults. The Court held "that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016, 108 S.Ct. at 2801 (citing *Kentucky v. Stincer*, 482 U.S. 730, 748, 107 S.Ct. 2658, 2669, 96 L.Ed.2d 631 (1987) (Marshall, J., dissenting)). In acknowledging the value of face-to-face confrontation with the complaining witness in the truth-finding process the Court noted:

It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusion.

*Coy*, 487 U.S. at 1019, 108 S.Ct. at 2802. The Court elaborated that although the rights conferred by the Confrontation Clause are not absolute, any exceptions would "be allowed only when necessary to further an important public policy." 487 U.S. at 1021, 108 S.Ct. at 2803. The Court declined to apply any exceptions in *Coy* because "there ha[d] been no individualized findings that these ... witnesses needed special protection...." *Id.*

This decision was followed by the case of *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). *Craig* challenged a Maryland statutory procedure allowing a victim of child abuse to testify via one-way closed circuit television. Unlike the statute involved in *Coy*, however, the Maryland Code required the trial judge to " 'first determin[e] that testimony by the child victim in the courtroom [would] result in the child suffering serious emotional distress such that the child cannot reasonably communicate.' " *Id.* at 841, 110 S.Ct. at 3161 (quoting MD.CTS & JUD.PROC.CODE ANN. § 9–102(a)(1)(ii) (1989)). In accordance with this procedure, the state presented expert testimony that the named victim and other child witnesses would be traumatized and unable to communicate effectively if forced to testify in front of the defendant. *Id.* at 842, 110 S.Ct. at 3161.

In determining whether the Maryland statute established an important public policy sufficient to warrant an exception to a defendant's right to face-to-face confrontation, the Supreme Court deferred to the state legisla-

---

**2.** The Iowa statute provided that:

A court may, upon its own motion or upon motion of any party, order that the testimony of a child, as defined in section 702.5, be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the court. Only the judge, parties, counsel, persons necessary to operate the equipment, and any person whose presence, in the opinion of the court, would contribute to the welfare and well-being of the child may be present in the room with the child during the child's testimony.

The court may require a party be confined to an adjacent room or behind a screen or mirror that permits the party to see and hear the child during the child's testimony, but does not allow the child to see or hear the party. However, if a party is so confined, the court shall take measures to insure that the party and counsel can confer during the testimony and shall inform the child that the party can see and hear the child during testimony.

Iowa Code § 910A.14(1) (1987). The judge elected to use a screen rather than closed circuit television.

ture's assessment of the importance of protecting victims of child abuse. *Craig,* 497 U.S. at 855, 110 S.Ct. at 3168–69. The fundamental issue thus became whether the state had made an adequate showing of necessity to justify admitting testimony outside the presence of the defendant. "The requisite finding of necessity must ... be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Id.* (citing *Globe Newspaper Co. v. Superior Court of Norfolk County,* 457 U.S. 596, 608–09, 102 S.Ct. 2613, 2621, 73 L.Ed.2d 248 (1982)). The Court ultimately concluded that the showing of necessity required to invoke the use of special procedures under the statute, "serious emotional distress such that the child cannot reasonably communicate," passed constitutional standards.

■ In the case now before us, however, the trial defense counsel contended that, in the absence of established procedures under the Rules for Courts–Martial or Military Rules of Evidence, use of televised testimony in courts-martial was not an option available to the Government. Record at 302; Appellate Ex. XXIV. The trial defense counsel also argued that the Government failed to establish the requisite showing of necessity to justify the use of any alternative to live, in-court testimony. Record at 303. We do not agree.

Within months of the Supreme Court's decision in *Craig,* Congress passed the Victims of Child Abuse Act of 1990 [hereinafter "the 1990 Act"]. Pub.L. No. 101–647, tit. II, § 201(a), 104 Stat. 4792 (1990) (codified at 42 U.S.C. § 13001 (Supp. IV 1992)). Within subtitle D of the 1990 Act, Congress provided procedures for the use of alternatives to live in-court testimony in proceedings involving offenses against children, including the use of two-way closed circuit television and videotaped depositions. *Id.* at § 225, 104 Stat. 4798 (codified at 18 U.S.C. § 3509(b) (Supp. IV 1992)). This section provides in part:

> The court may order that the testimony of the child be taken by closed-circuit television ... if the court finds that the child

is unable to testify in open court in the presence of the defendant, for any of the following reasons:

> (I) The child is unable to testify because of fear.

> (II) There is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying.

> (III) The child suffers a mental or other infirmity.

> (IV) Conduct by the defendant or defense counsel causes the child to be unable to continue testifying.

18 U.S.C. § 3509(b)(1)(B). A child is defined under the statute as any person under the age of 18. 18 U.S.C. § 3509(a)(2).

■ This legislation was adopted in response to the Supreme Court's decision in *Maryland v. Craig* and recognizes Congress' intent to adopt the public policy already established in numerous states to protect child witnesses who are the victims of child abuse "from the trauma of testifying." H.R.REP. No. 101–681(I), 101st Cong., 2d Sess. (1990) [hereinafter "1990 House Report"], *reprinted in* 1990 U.S.C.C.A.N. 6571, 6574 (quoting *Craig,* 497 U.S. at 855, 110 S.Ct. at 3168–69). Although Congress did not expressly provide for application of this provision at courts-martial, it did recognize the need to extend protections available to victims of child abuse in state proceedings to children residing on federal enclaves, including "military bases." 1990 House Report, 1990 U.S.C.C.A.N. at 6572. Before a complaining child witness may testify out of an accused's presence, the trial judge must find that the witness would "be traumatized not by the courtroom generally, but by the presence of the defendant.... [T]he emotional distress suffered ... [must be] more than *de minimis, i.e.,* more than 'mere nervousness or excitement or some reluctance to testify.'" *Craig,* 497 U.S. at 856, 110 S.Ct. at 3169 (citations omitted). Additionally, 18 U.S.C. § 3509 requires that the fear or trauma suffered by the child must be such that the child would be unable to communicate. *United States v. Carrier,* 9 F.3d 867, 871 (10th Cir.1993), *cert. de-*

815

*nied,* — U.S. ——, 114 S.Ct. 1571, 128 L.Ed.2d 215 (1994).

■ The trial judge may rely on the testimony of experts without observing the witness' demeanor in the courtroom prior to entering his findings. *Craig,* 497 U.S. at 860, 110 S.Ct. at 3171; *Carrier,* 9 F.3d at 870–71; *United States v. Farley,* 992 F.2d 1122, 1124 (10th Cir.1993). The judge's findings should not be reversed on appeal unless they are clearly erroneous. *United States v. Helms,* 39 M.J. 908, 911 (N.M.C.M.R.1993); *Carrier,* 9 F.3d at 870.

Even prior to the enactment of the 1990 Act, military courts had recognized the need to balance a servicemember's right to face-to-face confrontation with the trauma caused to the child from having to testify at courts-martial. *See United States v. Thompson,* 31 M.J. 168 (C.M.A.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991) (upholding 1989 conviction for sodomy of two minor boys who were allowed to testify with their backs to the accused); *Helms,* 39 M.J. 908 (N.M.C.M.R.1993) (upholding 1989 conviction for indecent acts upon a child under the age of 16 where victim was permitted to testify out of the presence of the accused via two-way closed circuit television).

Accordingly, we conclude that the prevention of further trauma to victims of child abuse testifying at courts-martial is an important public policy and that, notwithstanding the absence of any procedure particular to the military justice system, the provisions of the 1990 Act, as codified in 18 U.S.C. § 3509, are applicable and provide guidance for us. *Cf. United States v. Lewis,* 42 M.J. 1, 5 (1995). We also conclude that the Government presented an adequate showing of necessity to justify the military judge's findings allowing AL and CL to testify out of the appellant's presence.

Prior to CL testifying, the Government presented expert testimony from a clinical psychologist who had been treating CL over the preceding 18 months. She testified that CL was very guarded and that she didn't trust many people. She pointed out that CL's answers to questions during interviews changed depending on who was in the room. Record at 280–81. Trial counsel subsequent-

ly inquired as to this witness' opinion on the possible affect testifying in court would have on CL:

Q. What effects do you think that coming in here will—and talking about this molest, would have on ... [CL]?

A. I think it would be very, very dramatic for her, and I think we'd see serious psychological regressions for ... [CL]. And I think that the gains we've made psychologically would probably be aborted with her coming in here and testifying.

Q. Now, why do you say that?

A. Because she's terrified. She—The symptoms are still manifested in terms of the anuresis [sic], the bed-wetting; the encopresis which is defecating in pants; the nightmares, the sleeping disturbances, [ ] the eating disturbances, the inability to concentrate and pay attention, the daydreaming that she manifests. I think it would have a dramatic psychological effect on her.

Q. Is there anything—You said she would be—I'm sorry I forget your exact words, dramatic psychological effect; what in your opinion would have the most effect on her?

A. Being in the room, seeing her Dad.

Q. And why is that?

A. She's terrified of him.

Q. Do you think she would be able to talk?

A. I don't know, I don't think so.

Q. Why don't you think so?

A. She's frightened of him.

Record at 283. This testimony was the primary evidence presented on the issue and was unrebutted. Finding the evidence to be comparable to evidence relied upon in other federal appellate cases upholding the decision to allow a child witness to testify out of an accused's presence, we conclude that the military judge's findings were not clearly erroneous. *See Craig,* 497 U.S. at 842, 110 S.Ct. at 3161; *Farley,* 992 F.2d at 1124.

■ We acknowledge the Government did not strictly comply with the provisions of 18 U.S.C. § 3509 when CL was permitted to testify via one-way instead of two-way televi-

sion. Although Congress has expressed a preference for two-way televised testimony, with a defendant's video image capable of being observed by the witness, 18 U.S.C. § 3509(b)(2)(B)(iv), such a procedure is not constitutionally required. *Craig,* 497 U.S. at 859–60, 110 S.Ct. at 3171. In the absence of any allegation of prejudice resulting from the use of one-way television, we find the error to be harmless. *United States v. Shepard,* 38 M.J. 408, 413 (C.M.A.1993); UCMJ art. 59(a), 10 U.S.C. 859(a) (1994).

 Nor do we have any doubts that the military judge was correct in allowing AL to testify via closed-circuit television. The military judge noted, on the record, the following:

> After hearing her [AL's] testimony on three occasions both on direct and cross-examination, on the 9th of January, the 18th of January and the 23rd of January and in reviewing what transpired on each of those occasions, it's obvious to me that the witness was traumatized by these proceedings. On each of those occasions she demonstrated a reluctance to testify, in fact, a frightened demeanor. She broke out in tears on several occasions—numerous occasions. She physically trembled. At times, she entered into a trance-like state in response to questions by, even the government counsel.
>
> . . . .
>
> Now, I bore in mind that we heard no expert testimony on the issue of whether or not the witness would be traumatized to the point where she could not communicate as we did here concerning ... [CL]; however, my understanding of case law is that the expert testimony is not required when, in fact, we are treated—or should I say,

exposed to the actual traumatization before our very eyes.

Record at 443–444. We find, as did the military judge, that AL was traumatized as a result of the appellant's presence and her fear of him.[3] A state's interest in the physical and psychological well-being of child abuse victims is sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court. *Craig,* 497 U.S. at 853, 110 S.Ct. at 3167; *United States v. Thompson,* 31 M.J. 168 (C.M.A.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991); *United States v. Batten,* 31 M.J. 205 (C.M.A.1990).

Additionally, the findings by the military judge comply with the legislative intent of 18 U.S.C. § 3509. Although the 1990 Act anticipates that the parties will know in advance when the use of alternatives to live testimony procedures are desired and requires that a hearing be conducted prior to the taking of testimony, Congress did not intend to prevent the federal courts from acting when a child witness is demonstrably suffering trauma on the stand. *See* 1990 House Report, 1990 U.S.C.C.A.N. at 6574 (explaining that "once the trial has begun, the court may judge with its own eyes whether the child is suffering the trauma required to grant the requested order" for alternatives to live in court testimony under 18 U.S.C. § 3509). As a result, the military judge was correct in allowing closed-circuit questioning of AL.

 Finding no substantial error in allowing AL to testify via closed circuit television we now address whether her entire testimony should have been stricken when she prematurely terminated cross-examination by refusing to answer further questions.

---

3. Additionally, the military judge noted, on the record, the following regarding AL:

I will consider the apparent reluctance of the witness to enter the courtroom to begin with. I will consider the need for trial counsel to go [to] great lengths to talk her into the courtroom. I will consider her demeanor when she was testifying which appeared to the court to be one of an individual who was severely—or extremely reluctant to be here to begin with. She would take an enormously long period of time between questions. Some of her answers she did not give out

even though they were one word answers. Simple responses were two to three minutes. She had to be, if not asked leading questions, then she had to be coaxed throughout the testimony. She had her hair arranged in such a fashion that she could not see off to her left which is where the accused is sitting. Never once did she look in that direction. She broke down crying on at least two occasions in response to questions by trial counsel, actually shedding tears. Record at 296–97.

When a Government witness refuses to answer questions posed on cross-examination, the military judge must decide whether such refusal precludes inquiry into the details of the witness' direct testimony or relates purely to collateral matters affecting the witnesses credibility. If the precluded area of inquiry relates purely to collateral matters, the witness' testimony may be used against the defendant. If, however, the witness "precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of the direct testimony and, therefore, that witness' testimony should be stricken in whole or in part." *Cardillo*, 316 F.2d at 611, *cited with approval in United States v. Berrio–Londono*, 946 F.2d at 161; *Carlos v. Wyrick*, 753 F.2d 691, 693 (8th Cir.1985); *United States v. Stephens*, 492 F.2d 1367, 1374 (6th Cir.1974), *cert. denied*, 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974); *United States v. Newman*, 490 F.2d 139, 145 (3d Cir.1974).[4] "[S]triking the entire testimony[, however,] is a drastic remedy and is not to be lightly done." *United States v. Curry*, 993 F.2d 43, 45 (4th Cir.1993). When the witness has testified to several aspects of the Government's case, the more appropriate remedy is a partial striking of the witness' direct testimony as to those aspects the witness has prevented adequate cross examination. *Newman*, 490 F.2d at 146.

The appellant contends in his first assignment of error that the military judge abused his discretion when he declined to strike AL's testimony regarding the Melrose and Navy Lodge incidents. The military judge, however, determined that there had been substantial cross-examination on these specific incidents such as to provide the appellant with an adequate opportunity to test the truth of these allegations. Record at 474. Our standard of review on this issue is whether the military judge abused his discre-

tion in reaching his findings. *Curry*, 993 F.2d at 45; *Berrio–Londono*, 946 F.2d at 160.

The appellant maintains that although his individual military counsel did, at trial, extract bits and pieces of details surrounding the incidents from an extremely belligerent and uncooperative AL, he was never able to challenge AL's credibility. Assignment of Error and Brief on Behalf of Appellant, filed 16 June 1993, at 14. Such an argument actually validates the military judge's findings. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985), *quoted in United States v. McGrath*, 39 M.J. 158, 162 (C.M.A.1994). "The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion." *Id.* at 21–22, 106 S.Ct. at 295.

The trier of fact was able to take into consideration AL's refusal to answer certain questions, her forgetfulness as to the particulars of the incidents, and her general demeanor. These factors alone provided defense counsel with a substantial opportunity to challenge AL's credibility. Such an opportunity is sufficient to satisfy the Confrontation Clause. *See Government of the Virgin Islands v. Riley*, 754 F.Supp. 61 (D.V.I.1991) (holding that child witness' refusal to respond to questions after defense counsel had already challenged witness' recollection of events did not deny Confrontation Clause). Accordingly, we conclude that the military judge's findings were not clearly erroneous.

Nor do we find any merit in appellant's fourteenth and fifteenth assign-

---

4. Although *Cardillo*, as well as most of the other cases cited for this principle, concern situations where a Government witness invokes his Fifth Amendment right against self-incrimination during cross-examination, we believe, as do other federal courts, that these principles can be applied any time a witness refuses to respond to questions posed on cross-examination. *See Car-*

*los v. Wyrick*, 589 F.Supp. 974 (W.D.Mo.1984), *aff'd*, 753 F.2d 691 (8th Cir.1985) (applying *Cardillo* where Government witness testifying under grant of immunity at murder trial refused to respond to defense inquiries regarding the identity of witness' companion on the night of the murder).

ments of error. In his fourteenth assignment of error, the appellant argues he was denied certain Constitutional rights at an administrative discharge review. This Court has no authority to review such proceedings. UCMJ art. 66, 10 U.S.C. § 866 (1994). He must look elsewhere for relief if he believes he has been injured. In his fifteenth assignment of error the appellant argues that he was denied his Constitutional right to be confronted with the witnesses against him when the Government failed to call AL and CL at the Article 32, UCMJ, Investigation. No objection, however, to any perceived defect in the Article 32 investigation was made at trial. "Failure by a party to raise defenses or objections or to make motions or requests which must be made before pleas are entered ... shall constitute waiver." Rule for Courts–Martial [R.C.M.] 905(e).

### III. Discovery

■ In his tenth assignment of error, the appellant argues he was denied equal opportunity to inspect evidence available to the Government when the military judge conducted an *in camera* review of the California Child Protective Services [CPS] records and case notes. The record, however, shows otherwise. Trial counsel had no more access to the CPS records than did the appellant. Record at 606. The original trial counsel, Lieutenant [LT] Karpel, whom LT Sulik had replaced, reviewed the CPS files but refused to discuss their contents with LT Sulik. Any potential access problems created by the military judge's decision to conduct an *in camera* inspection of the CPS files in order to protect their confidentiality was solved by LT Karpel's recusal from the case and his refusal to disclose what he knew regarding the content of the files to LT Sulik.

The record is somewhat clouded by an offer of proof that the trial defense counsel made concerning that to which LT Karpel

would testify, *i.e.*, LT Karpel would indicate that he copied part of the CPS records and that they were included in the file he turned over to LT Sulik. LT Sulik, as noted above, disagrees that she had access to any part of the CPS records. Even if the trial defense counsel did have access, the military judge's *in camera* inspection and subsequent release of all pertinent parts of the records gave the defense counsel equal access to all relevant parts of the record.[5] *Pennsylvania v. Ritchie*, 480 U.S. 39, 61, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987).

■ We agree with the appellant's assignment of error twenty-one, that the Government had a duty to disclose the transcribed version of the Naval Investigative Service [NIS] (now the Naval Criminal Investigative Service) videotaped interview of AL on 30 November 1989. The Government contends that they were not required to disclose the transcript because it was turned over to the CPS and as such "the Government did not have possession, custody, or control" of the transcript or videotape. Consolidated Government Reply to Consolidated Assignments of Error, filed 29 September 1994, at 59. This argument is disingenuous.[6] The interview was conducted by an NIS agent for investigative purposes and was transcribed on NIS letterhead. Turning over the transcript to CPS did not terminate the Government's obligation under R.C.M. 701 and the Jencks Act to provide the appellant with the copy upon a timely discovery request. R.C.M. 701(a)(2); 18 U.S.C. § 3500 (1988). This document was created by the Government who could not avoid obligations under the Jencks Act by technically divesting itself of possession. *United States v. Heath*, 580 F.2d 1011 (10th Cir.1978), *cert. denied sub nom. Babb v. United States*, 439 U.S 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979). We also note that the Government only contends that the transcript was turned over to CPS

---

5. This Court subsequently ordered all of the CPS records released to appellant and his appellate counsel. Neither has made mention of any parts of these records that would have aided the appellant during his court-martial.

6. We note that the military judge permitted trial defense counsel to review certain materials

which were contained in the CPS files. The transcript of the video taped interview was one of the records contained in the file, but because the record does not clearly delineate that the transcript was one of the records that trial defense counsel was provided, we will assume that he did not have access to the transcript.

but does not mention the whereabouts of the actual video tape.

Despite the Government's failure to disclose either the videotape or the transcript thereof, we are convinced that the error was harmless beyond a reasonable doubt. *United States v. Charles,* 40 M.J. 414 (C.M.A. 1994); *United States v. Douglas,* 964 F.2d 738 (8th Cir.1992). The transcript of the interview with AL was contained in the CPS files which we made available to the appellant. The transcript has been attached to the record of trial as part of the Appellant's Consolidated Pleadings, filed 7 September 1994, and appellant has failed to assert any possible prejudice due to the unavailability of the transcript at trial.[7] We have reviewed the transcript and find it consistent with statements previously provided by AL. Investigating Officer's Ex. 7. Additionally, most of the acts of molestation discussed in the transcript were later dismissed when AL was unable to submit to cross-examination in regards to these allegations.

The appellant's sixteenth assignment of error is without merit. The placement of the appellant's children in separate foster homes under the direction of the Child Protective Services as supervised by the San Diego County Juvenile Court is not a matter within our purview. Additionally, it is solely within the discretion of AL and CL, or their respective foster parents who were charged with their welfare, to submit to *pretrial* interviews. *United States v. Alston,* 33 M.J 370, 373 (C.M.A.1991). Even if this allegation were valid, however, it was waived, when the appellant failed to raise it at trial. R.C.M. 905(e).

### IV. Conduct of the CPS Case Workers

In his ninth assignment of error, the appellant argues he was denied his Constitutional right to a fair trial when the military judge admitted into evidence testimony which was false and coerced. In substance, the appellant argues he was prejudiced by the testimony of various Government witnesses who testified about admissions of the

appellant and the treatment and statements of the victim-children which, he argues, was fabricated. The appellant disagrees with the substance of the testimony of these witnesses.

Clearly their testimony was relevant, and thus admissible. *See* Mil.R.Evid. 401, 402, 403. Once admitted, it was for the factfinder to determine the weight to be given these witnesses. There has been no showing, on the record or otherwise (as we also point out in our discussion of assignment of error XI, *infra*), that the testimony of these witnesses was fabricated, false, or coerced. We conclude that this assignment of error also lacks merit.

In his eleventh assignment of error, the appellant argues he is entitled to a new trial on the grounds of newly discovered evidence. He contends that a San Diego County grand jury has found that workers within the county's juvenile system manipulated witness testimony and committed perjury in trials stemming from their investigation. We have previously reviewed this assignment of error after examining the grand jury's report and determined then, as we do now, that it lacks merit. *See United States v. Longstreath,* No. 910774R (N.M.C.M.R. 23 February 1993) (order). There has been no showing that any of the witnesses at the appellant's court-martial either manipulated testimony or committed perjury, and we find none.

### V. Remaining Issues

In his second assignment of error, the appellant argues that the Government failed to prove the appellant guilty beyond a reasonable doubt to specifications 2 and 13 of Charge III. We disagree. We find that the evidence of record supports the findings, and we, too, are convinced of the appellant's guilt beyond any reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987).

Nor do we find any merit in assignment of error III. We find that a sentence which includes 6 years of confinement coupled with a dishonorable discharge entirely

---

7. Appellant broadly asserts that the transcript is exculpatory without directing our attention to

any exculpatory material contained in the transcript.

appropriate under the circumstances of this case.

■ In the fourth assignment of error, the appellant alleges his trial defense counsel was ineffective because he failed to call certain witnesses who could have provided exculpatory testimony on the merits and because he elected trial by military judge alone. As for the latter part of this assignment of error, we note that the appellant, himself, on the record elected trial by military judge alone after his forum options were fully explained. Record at 77. This portion of the assigned error is clearly without merit.

As to the first part, the U.S. Court of Military Appeals (now the Court of Appeals for the Armed Forces) has said:

To show that his trial defense counsel was ineffective, an accused must demonstrate that his counsel was seriously deficient in some manner and that there is a reasonable probability that, but for this deficiency, the result of the proceeding would have been different. In weighing such matters, we must give deference to counsel's tactical judgment and not substitute our view with the benefit of hindsight.

*United States v. Bono*, 26 M.J. 240, 242 (C.M.A.1988) (citations omitted). The appellant, however, has provided little information as to the identity of these witnesses and none with respect to how they were relevant and exculpatory.[8] Thus the appellant has failed to meet his burden to demonstrate that his counsel was deficient in any manner, much less that the deficiency would have caused a different result. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Assignments of error V, VI, VII, and VIII have previously been decided adverse to the appellant's contentions and will not be addressed further. *Weiss v. United States*, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

■ In his twelfth assignment of error, the appellant alleges the convening authority acted improperly when he took his action on an incomplete record. He argues the record is incomplete because it does not contain the CPS records. The CPS records have now been attached to the record pursuant to our order; the record is now complete. As for the state of the record when the convening authority took his action, insubstantial omissions from a record of trial do not affect its characterization as a verbatim transcript. *United States v. Lashley*, 14 M.J. 7 (C.M.A. 1982).

■ While a missing exhibit may render a record materially incomplete, it does not affect its verbatim status. *United States v. Wynn*, 23 M.J. 726, 728 (A.F.C.M.R.1986), *vacated on other grounds*, 26 M.J. 232 (C.M.A.1988) (summary disposition), *appeal after remand*, No. 25255 (A.F.C.M.R. 28 Jul 1988), *aff'd*, 29 M.J. 143 (C.M.A.1989); *United States v. Eubank*, 12 M.J. 752 (A.F.C.M.R. 1981); *see also United States v. Le Prowse*, 26 M.J. 652 (A.C.M.R.1988) (holding that omission of exhibits—books—was insubstantial where military judge described the books); *United States v. Harper*, 25 M.J. 895 (A.C.M.R.), *petition denied*, 27 M.J. 418 (C.M.A.1988) (holding that omission of personnel file as an appellate exhibit was insubstantial where military judge perused the file prior to determining admissibility of other exhibits); *United States v. Baker*, 21 M.J. 618 (A.C.M.R.1985), *pet. denied*, 22 M.J. 89 (C.M.A.1986) (holding that omission of written request for enlisted members insubstantial).

■ The record accurately and completely reflects what occurred at trial and includes everything the trier of fact had before him when he made his findings and sentence determinations. The CPS records were never admitted into evidence. They were only attached as an appellate exhibit so that any possible issue relating to the military judge's

---

8. In fact in the Appellant's Brief Expanding upon Appellant's Informal Supplemental Brief and Motion for Leave to Attach Document to Extend Appellant's Informal Supplemental Brief, filed 8 December 1993, at 5, appellate defense counsel notes that "[d]ue to the unknown whereabouts of some witnesses and the lack of cooperation by other witnesses, appellant defense counsel has been unable to successfully investigate the actual existence, if any, of defense counsel deficiencies."

*in camera* review of them could be preserved for appellate review. Record at 609. Therefore, the CPS records had no affect on the findings or the sentence as adjudged and the appellate has not indicated how he was prejudiced by the inability of the convening authority to consider them.

We also find no merit in assignments of error XVII, XVIII, and XIX.

As to assignment of error XXII, we find no error in the military judge's decision to admit expert testimony on the child abuse accommodation syndrome. Such testimony was clearly relevant and helpful to the military judge, as the fact-finder, in evaluating the testimony of the children. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Rodriguez,* 37 M.J. 448 (C.M.A.1993).

Finally we conclude that the appellant waived any violation of his right to speedy trial under R.C.M. 707 when he did not raise the issue at trial. R.C.M. 707(e).

Accordingly, the findings and sentence, as approved on review below, are affirmed.

Senior Judge ORR and Judge KEATING concur.